[Civ. No. 17159.   First Dist., Div. One.   Mar. 26, 1957.]

R. H. SHAFFORD, Respondent, v. OTTO SALES COMPANY, INC. (a Corporation), et al., Defendants; WALTER E. OTTO, SR., Appellant.

Fabian D. Brown for Appellant.

Bledsoe, Smith, Cathcart, Johnson & Phelps and R. S. Cathcart for Respondent.

WOOD (Fred B.), J.—Plaintiff Shafford brought this action to recover his commissions on sales of cocoanut from Otto Sales Co., Inc., a corporation, to the B & O Nut Company.   In addition to the Otto Sales corporation he joined Walter E. Otto, Sr., as a defendant, upon the theory that Otto used the corporation as a shield to cover up his activities as an individual.   Shafford recovered judgment against each, which was affirmed as against the corporation but reversed as against Otto.   (*Shafford* v. *Otto Sales Co., Inc.,* 119 Cal. App.2d 849 [260 P.2d 269].)

In reversing as to Otto, Sr., (hereinafter called "Otto"), we indicated that much of the significant evidence in the case came in through the deposition of one Grantier but applied only to the defendant corporation, not to Otto, because the deposition was taken before process had been served upon Otto. Especially, did we note that there was no evidence that the corporation was used as a shield by Otto to cover up his activities as an individual; no evidence that plaintiff believed he was dealing with Otto personally; no evidence that plaintiff placed any reliance upon such a belief; no evidence that the corporation was undercapitalized or not financially responsible; and no evidence that any inequitable result would follow a refusal to disregard the corporate entity. (See pp. 860 and 861 of 119 Cal.App.2d.)

Upon the retrial, the record of that portion of the former evidence which applied to Otto was put in evidence. Grantier's deposition was again taken and the testimony of Otto and other witnesses was also taken, addressed to the issues indicated in our former opinion. There resulted a judgment against Otto based upon findings the more significant features of which may be summarized as follows:

(1) For a period of 15 years prior to December 16, 1946, Otto had been doing an export and import business in San Francisco under the name of "Otto Sales Company"; (2) on December 16, 1946, Otto caused to be filed with the Secretary of State articles of incorporation relating to "Otto Sales Company, Inc." and later caused to be filed with the State Corporation Commissioner an application on behalf of said corporation for the issuance of stock therein; (3) a permit was issued authorizing the issuance of certificates of stock but the corporation never issued any valid certificates pursuant to the permit or otherwise; (4) Otto invested $50.00 in the purported corporation and caused its books to be set up with an outstanding capital of $50.00; the purported corporation never had in excess of $50.00 in its stated capital account; (5) the purported corporation was grossly undercapitalized and has been at all times subsequent to December 31, 1947, and now is insolvent; (6) the purported corporation has wholly failed and is financially unable to pay the judgment recovered against it in favor of plaintiff on the prior trial of this action; (7) Otto formed the purported corporation merely as an instrumentality through which he, for his personal convenience, transacted business; (8) at all times referred to in the complaint the purported corpora-

tion was dominated and controlled by Otto and at all of said times was the *alter ego* of Otto and merely the conduit through which Otto performed the acts and made the promises and representations hereinafter referred to; (9) it is and would be inequitable to recognize any corporate entity separate and apart from Otto; (10) on January 9, 1948, Otto controlled and owned all the output of a certain desiccated cocoanut factory in the Philippine Islands; (11) on January 9, 1948, Otto entered into an oral contract with plaintiff under the terms of which he employed plaintiff to sell for the account of Otto said factory's entire output of desiccated cocoanut for a term of one year and promised to pay plaintiff a commission of 5 per cent on gross receipts derived from such sales to any purchaser procured by plaintiff; (12) pursuant to said contract plaintiff promised to and did use his best efforts to procure a purchaser or purchasers and did procure and introduce to Otto on January 9, 1948, a purchaser, the B & O Nut Company, ready, willing and able to purchase the total annual output of said factory for one year at the prevailing market price; (13) between April 28 and September 27, 1948, Otto sold and delivered to B & O Nut Company and the latter paid Otto for the desiccated cocoanut produced at said factory a total purchase price of $250,788.46; (14) pursuant to Otto's contract with plaintiff there became payable from Otto to plaintiff his commission of 5 per cent of said purchase price or the sum of $12,539.42; (15) said sum has been payable from Otto to plaintiff ever since November 1, 1948, with interest at 7 per cent per annum from said date, amounting to $5,850.89 calculated through June 30, 1955. Accordingly, judgment was rendered in favor of plaintiff in the sum of $18,390.31 with interest thereon at 7 per cent from July 19, 1955, until paid.

These findings are adequately supported by the evidence, except possibly as to the date (December 31, 1947; see clause (5), above) from and after which the corporation has been insolvent. The corporation's balance sheet for December 31, 1947, indicated a surplus of assets over liabilities amounting to $27,000. Plaintiff claims that the trial court was entitled to and presumably did impliedly find that a number of items listed as assets were of little or no value. That may well be. The corporation had no real property and its assets consisted largely of accounts receivable. From the beginning the bank which handled the corporation's credit held all the assets in pledge. But insolvency on that particular

date is not an indispensable basis for the trial court disregarding the corporate entity. The evidence quite clearly shows that the corporation's liability exceeded its assets, beginning at least as early as December 31, 1948. ▮▮ The gross undercapitalization, the failure to effect a legal issue of shares of stock, the promptness with which corporate insolvency did ensue, and other pertinent factors, support the action of the trial court in disregarding the corporate entity.

It is not necessary to summarize the evidence. It is well, however, to mention a few bits of evidence that are reflected but not specifically mentioned in the findings: Immediately after formation of the corporation, Otto advanced it $25,000, the amount required to open its bank account with the bank that undertook to extend it credit. That loan has never been repaid. The minute book of the corporation is very meager. It has very few entries of action, if any, taken by the board of directors or by the stockholders. During the period of his negotiations with Otto (1947-48) plaintiff did not know that Otto Sales Company was a corporation, nor did he understand that he was dealing with a corporation. He wrote to the company many times and received replies written on the letterhead which apparently had been used by Otto prior to the incorporation, while he was doing business under the name of "Otto Sales Company." The only form of contract furnished plaintiff for use in soliciting business was the old one formerly used by Otto personally. It was headed by the caption "W. E. Otto" and in the space at the bottom (for seller's signature) it read "W. E. Otto, by ——————, Sellers." Grantier (a former employee of Otto or of the corporation), testified that Otto was the head of the firm, the sales manager, the man in charge. Grantier was not told there were any other officers. He confirmed plaintiff's testimony as to the terms of plaintiff's contract and the circumstances under which it was negotiated. He also said that after plaintiff had introduced to Otto representatives of the B & O Nut Company as prospective buyers, plaintiff inquired of Grantier whether the Nut Company had signed a contract. Otto said they had signed but instructed Grantier to tell plaintiff "the deal is pending and we will let him know as soon as we can ship the cocoanut." Later, in response to a further inquiry from plaintiff, Otto told Grantier to tell plaintiff "the deal has fallen through."

The most recent exposition of the basis for disregarding

the corporate entity appears in *Automotriz etc. De California*
v. *Resnick,* 47 Cal.2d 792, 796 [306 P.2d 1], Chief Justice
Gibson speaking for the court: "It is the general rule
that the conditions under which a corporate entity may be
disregarded vary according to the circumstances in each case.
(See *H. A. S. Loan Service, Inc.* v. *McColgan,* 21 Cal.2d
518, 523 [138 P.2d 391, 145 A.L.R. 349]; *Stark* v. *Coker,*
20 Cal.2d 839, 846 [129 P.2d 390].) It has been stated that
the two requirements for application of this doctrine are
(1) that there be such unity of interest and ownership that
the separate personalities of the corporation and the indi-
vidual no longer exist and (2) that, if the acts are treated
as those of the corporation alone, an inequitable result will
follow. (*Stark* v. *Coker,* 20 Cal.2d 839, 846 [129 P.2d 390];
*Watson* v. *Commonwealth Ins. Co.,* 8 Cal.2d 61, 68 [63 P.2d
295].)

"The failure to issue stock or to apply at any time for a
permit although not conclusive evidence, is an indication that
defendants were doing business as individuals. (*Geisenhoff*
v. *Mabrey,* 58 Cal.App.2d 481 [137 P.2d 36]; see *Marr* v.
*Postal Union Life Ins. Co.,* 40 Cal.App.2d 673 [105 P.2d
649].) In the Marr case the court stated: 'While the fact
standing alone that a corporation remains inchoate without
stockholders or stock is not of itself determinative of an
*alter ego* relationship upon its part, nevertheless it does in-
dicate that such corporation may exist merely to serve the
interests of another—a corporation or an individual.' (40
Cal.App.2d at p. 682.)

"Another factor to be considered in determining whether
individuals dealing through a corporation should be held
personally responsible for the corporate obligations is whether
there was an attempt to provide adequate capitalization for
the corporation. In Ballantine on Corporations (rev. ed.,
1946), at pages 302-303, it is stated: 'If a corporation is
organized and carries on business without substantial capital
in such a way that the corporation is likely to have no suffi-
cient assets available to meet its debts, it is inequitable that
shareholders should set up such a flimsy organization to
escape personal liability. The attempt to do corporate busi-
ness without providing any sufficient basis of financial re-
sponsibility to creditors is an abuse of the separate entity
and will be ineffectual to exempt the shareholders from
corporate debts. It is coming to be recognized as the policy
of the law that shareholders should in good faith put at

the risk of the business unincumbered capital reasonably adequate for its prospective liabilities. If the capital is illusory or trifling compared with the business to be done and the risks of loss, this is a ground for denying the separate entity privilege.'

"The rule that inadequate capitalization may be considered as a factor in determining whether the corporate entity should be disregarded was followed in *Shea* v. *Leonis,* 14 Cal.2d 666 [96 P.2d 332, 334], where a lessee attempted to escape liability for rent due under a lease by assigning his interest in the lease to a corporation which was without other assets. The court held that the owners of the corporate stock were liable for the rental payments, pointing out that it is proper to disregard corporate existence 'where, as in the instant case, the device adopted is . . . an attempt to avoid liability for benefits enjoyed by means of taking the obligation in the name of a specially organized corporation which has no other assets.' In *Carlesimo* v. *Schwebel,* 87 Cal.App.2d 482 [197 P.2d 167], it was recognized that 'the proper rule is that inadequate financing, where such appears, is a factor, and an important factor, in determining whether to remove the insulation to stockholders normally created by the corporate method of operation.' (See also *Mosher* v. *Salt River Valley Water Users' Assn.,* 39 Ariz. 567 [8 P.2d 1077]; Ballantine, *Corporations*: '*Disregarding the Corporate Entity' as a Regulatory Process* (1943), 31 Cal.L.Rev. 426, 427; Fuller, *The Incorporated Individual*: *A Study of the One-Man Company* (1938), 51 Harv.L.Rev. 1373, 1381-1383; *cf. Dixie Coal Min. & Mfg. Co.* v. *Williams,* 221 Ala. 331 [128 So. 799].)''

The respective functions of the trial court and of a reviewing court, in any such inquiry, we find well expressed in *H. A. S. Loan Service, Inc.* v. *McColgan,* 21 Cal.2d 518 [138 P.2d 391, 145 A.L.R. 349]: "Plaintiff argues that in order to authorize the disregard of a corporate entity the evidence must be convincing and satisfactory and that a presumption of separate entity is present. However that may be, such rules are for the guidance of the trier of fact, and the rule on appeal is the same as in other cases; the conclusion of the trier of fact will not be disturbed if it is supported by substantial evidence. The same principle is pertinent in analogous instances involving the proof of fraud. (See 12 Cal.Jur. 834.)'' (P. 524.)

Likewise, in our case, we believe there was sufficient evidence before the trial court to justify it in determining that

a sound basis existed for disregarding the corporate entity and in holding Otto personally liable.

Otto sought by the witness Evangelyn Bozeny, who was secretary of the corporation in 1948, to show that Otto made certain proposals which were overruled by the board of directors. The judge ruled that a record of such incidents should have been in the corporate minutes; hence, it was incumbent upon Otto to produce the minutes. This, probably, is sustainable under the best evidence rule. Moreover, Otto got such evidence in later when in support of his effort to do so his counsel directed particular attention to the testimony of Grantier that Otto dominated the corporation and stressed Otto's desire to rebut that testimony. If counsel had made that explanation to begin with, the court doubtless would have let the evidence in when first offered.

Finally, Otto asserts that he did not have a fair trial, claiming that the judge was overbearing toward counsel and the witnesses, though admitting that this is not disclosed by the typewritten record. Of this, plaintiff says in his brief "the trial judge may not have 'conducted himself with the imperturbability of a Rhadamanthus.' (*United States* v. *Dennis* (C.C.A.2d 1950), 183 F.2d 201, 206, . . . [speaking of Judge Medina]) but the appellant's pretense that he had made no record of transactions involving substantial sums of money was not such as to gain the confidence of the trier of fact." Moreover, there was no jury. Accordingly, appellant's claim that he had an unfair trial fails of support.

The judgment is affirmed.

Peters, P. J., and Bray, J., concurred.

A petition for a rehearing was denied April 25, 1957, and appellant's petition for a hearing by the Supreme Court was denied May 22, 1957.